## LEO LERA V. THE STATE.

No. 20515. Delivered November 8, 1939.
Rehearing Denied December 20, 1939 .

The opinion states the case.

*Marsene Johnson, Jr.,* of Galveston, for appellant.

*Chas. H. Theobald,* County Attorney, of Galveston, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is murder; the punishment, death.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Harry Phillips by shooting him with a gun.

Omitting the formal parts, bill of exception No. 2, as qualified, reads as follows:

"The testimony showed that the cause of the death of deceased was a bullet fired from a pistol, entering just behind the left ear in the area of the mastoid bone, ranging upward and coming out of the head above and in front of the right ear.

"Before midnight or Christmas Eve, 1938, deceased and his fiancee, and John Miranda and Miss Sharp drove out to a place called 'Deppens,' where food and drink were sold.

"In front of the bar were stools or seats where this party of four sat to celebrate the engagement of deceased; the bar was on the West side of the room, and the seats ran South and North; Miranda taking the nearest seat to the South, Miss Sharp next to him, the fiancee next, and deceased on the fourth seat. About 12:30 a. m. of December 25th, 1938, deceased took his fiancee to her home, and at 1:35 a. m. came back alone to 'Deppens.'

"While deceased was gone, defendant, Miss Jen Bennett, Mike Calandra and Fred Vaiani came into 'Deppens' and sat down in the next four seats North of Miss Sharp and Miranda, and put in their order for food. Miss Sharp testified that defendant sat next to her, that is, in the third seat.

"When deceased came in no one was then in the third seat, and he half-way sat down on the third seat, facing South. Miss Sharp testified that defendant approached deceased, and said :'Buddy, you have my stool. Do you mind,' and that deceased replied: 'I am sorry. Do you mind,' and that immediately following the answer of deceased to defendant that defendant hit deceased with his fist, and that Calandra was pushing Miranda toward her, and she saw defendant with a pistol pointed up in the air, and when she saw the gun she ran into the kitchen.

"Miranda testified that when deceased came back he half-way sat down on the third stool, and said he was ready to leave, so witness started to the door and as he turned around he saw defendant hit deceased, and he started back when Calandra shoved witness back and witness grabbed Calandra, and in just a few seconds he saw defendant with his gun, and heard four or five shots, and deceased fell to the floor, and witness went to the telephone, and afterward took deceased to the hospital. The shots were fired about two minutes after the return of deceased.

"After he was shot, deceased did not say anything. Four bullet holes were found in the ceiling, and an officer dug one bullet out; it was from a 45-calibre pistol, and defendant's pistol was a 45-automatic. The members of one party did not know the members of the other party.

"Benny Stephens, the bartender, testified: That he knew Calandra and the defendant; that he was at the cash register and heard some reports that he thought were fire-crackers at first, and he looked around after the second report, and saw defendant with a pistol up in the air and it was going off, and deceased, who was close to defendant, was trying to 'rush' the defendant, or trying to push his arm away, and then about

that time deceased fell. Witness saw no blow struck, and heard no conversation, except that defendant said: 'What happened? What happened? It was an accident.' Witness testified that when deceased returned he toook the stool that Mike Calandra had occupied; that Calandra had left it and was telephoning; that defendant sat next to Calandra, that is, on the fourth stool, and that Miss Bennett was sitting to the right of defendant.

"Defendant's own testimony is, that when his party came in and ordered their drinks and food, the seating arrangement was such that Mike Calendra sat in the seat to defendant's left, and defendant in the seat North of Calandra, and Miss Bennett in the next seat to the right of defendant; that Calandra left his seat, and that a person he now knows was deceased, came to the seat Calandra had occupied; that Calandra returned to this seat that was now occupied by deceased and tapped deceased on the shoulder and said: 'Buddy, you have my seat, do you mind?' That deceased said something to Calendra that defendant did not hear and about that time Calendra hit deceased in the face, and, as defendant turned to the South on his stool, Miranda grabbed Calandra and there was a scuffle, and that defendant pulled his pistol out and raised it in the air, intending to shoot it in the air, and trying to scare them and maybe stop the fight, and that deceased grabbed his arm and they had a scuffle during which the pistol fired, and that he did not know at which shot deceased was hit. That when deceased fell, defendant hollered: 'What happened? It is an accident.'

"Defendant also testified that he never knew deceased before; that it was not he who hit deceased with his fist, but that it was Calandra; and that he had no intention to shoot deceased, and that it was an accident.

"After deceased was taken to the hospital, defendant drove Miss Bennett home, and then returned the automobile he had borrowed, and then with Mike Calandra went to the police station and surrendered.

"And on cross-examination of defendant by Hon. Emmett Magee, Assistant County Attorney of Galveston County, for the purpose of impeaching and contradicting the testimony of the defendant who had just testified that he fired his gun to scare and without intent to shoot deceased, and that Calandra, and not he, had struck deceased, brought before the jury, by a question only, the fact that defendant had told Mr. Theobald, the County Attorney, and himself down at the police

station, on the night of the killing, that he, defendant, did not know how it (meaning the homicide) happened.

"The said question to the defendant was:

" 'Isn't it a fact that you told Mr. Theobald and me down at the police station on the night of the killing that you did not know how it happened?'

"The question assumed the fact to be that defendant did tell these gentlemen that he did not know how the homicide happened. The question assumed the truth of this matter. The jury were liable to conclude that said State's Counsel would not have asked said question, in the form as asked, unless he had knowledge that such was the case. The question was not answered, but it was stated in such manner that the jury did not fail to understand what was meant, and so as to make them believe that defendant did make such statement at the police station, and that defendant did not then tell said prosecuting attorneys, that it was Calandra, and not he, who struck deceased ,and that the gun was shot to scare only and without intent to shoot deceased.

"Before said question was asked, neither defendant nor the court had any intimation that the State's counsel would seek to put in evidence any statement made by the defendant at the police station, where he was under arrest and in custody of the peace officers of Galveston; and, therefore, defendant had no opportunity to object to said question before it was asked. The facts in evidence had already shown that defendant had gone home after the homicide, changed clothes, drove back to the beach, and had talked and been with several persons before going to the police station and surrendering, and at the time the statement so put before the jury was made, it was an oral statement, which was not admissible as a part of the *res gestae*, and was made while defendant was under arrest and so in custody, and was not a part of any conversation or transaction put in evidence by the defendant.

"And as soon as said question was so asked, and before it was answered, defendant, by his attorney, objected thereto; the statement of defendant while in custody being obviously inadmissible for any purpose, and the Court sustained the objection, it being obvious to the Court that the question brought before the jury an oral statement of defendant, made while under arrest, and in custody at the jail, and without any statutory warning, and not otherwise admissible, and which statement might be used by the State as a criminative fact; whereupon, defendant's attorney took a bill of exceptions to the question, and asked the Court to instruct the jury, and

whereupon the Court said: 'Mr. Magee, you well know the rules of evidence,' and Mr. Magee said: 'Yes, sir,' and the Court continued: 'And any statement made by this man while under arrest is, by statute, inadmissible unless the statutory warning is given;' and Mr. Magee said: 'That is right,' and then the Court said to the jury: 'Gentlemen of the jury, you will disregard the last question and answer,' and defendant's attorney again took a bill of exceptions thereto.

"And said Assistant County Attorney is a reputable prosecutor, and stood well in Galveston County and with the jury that tried this cause, and members of the jury were acquainted with him.

"The Court certifies that it is necessary to a full understanding of this bill of exceptions, that the matter be stated in somewhat question and answer form.

"And defendant here now tenders this, his bill of exceptions No. 2, to said question and incident, and the said implications therefrom, and asks that the same be by the Court allowed, approved, signed and ordered filed by the clerk of this court, as a part of the record in this cause; which is accordingly done, this the_____ day of_____A. D. 1939.

"See next page for approval CGD

"Judge Presiding.

"Defendant's foregoing bill of exception No. 2 has been carefully considered and is approved, allowed, signed and ordered filed by the Clerk of this Court as a part of the record in this cause, subject, however, to the following explanatory qualification:

"While defendant, Leo Lera, was on the witness stand testifying as a witness in his own behalf he stated and testified as follows:

" 'After this shooting had taken place and I saw Mr. Phillips lying there on the floor, I said: 'What happened? It was an accident.' (P. 6, St. F.)

"And again at page 58, St. F., Lera testified:

" 'Mr. Phillips fell. When Mr. Phillips fell I hollered: 'What happened? It was an accident.' And then there was a lot of confusion. I heard someone say, 'He is shot.' "

It is clear from the bill of exception that appellant was under arrest at the time he made the statement to the county attorney and his assistant relative to the homicide and that such statement was not res gestae. Further, it is made manifest from the bill that the provisions of Art. 727, C. C. P., had not been complied with. We quote the article:

"The confession shall not be used if, at the time it was made, the defendant was in jail or other place of confinement, nor while he is in the custody of an officer, unless made in the voluntary statement of accused, taken before an examining court in accordance with law, or be made in writing and signed by him; which written statement shall show that he has been warned by the person to whom the same is made: First, that he does not have to make any statement at all. Second, that any statement made may be used in evidence against him on his trial for the offense concerning which the confession is therein made; or, unless in connection with said confession, he makes statements of facts or circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed. If the defendant is unable to write his name, and signs the statement by making his mark, such statement shall not be admitted in evidence, unless it be witnessed by some person other than a peace officer, who shall sign the same as a witness."

The purpose and effect of the quoted statute is to prevent the prosecution from using against the accused a verbal statement made by him while he is in custody or confinement which the State seeks to use in proving his guilt. Lightfoot v. State, 35 S. W. (2d) 163. Proof of a confession or of a statement of facts amounting to a confession, made while the accused is in custody or confinement, and which would not be admissible as original evidence, is not admissible to impeach the accused. Lightfoot v. State, supra.

Under the circumstances reflected by the bill of exception the question was not warranted and the court's action in sustaining the appellant's objection was correct. If we can say that the mere asking of such questions was not obviously prejudicial and hurtful it would follow that harmless error is presented. On the other hand, if we are driven to the conclusion that it is impossible for us to gauge the evil effect upon the jury of such improper question and that its mere asking was calculated to lead them to believe that appellant had made a statement to the county attorney and his assistant strongly combating the testimony he had given upon the trial in support of his defensive theory, it becomes our duty to order a reversal of the judgment. Looking to the situation in the light of the fact that the jury could have reached no other conclusion than that the appellant stated to the prosecuting officers while under arrest that he did not know how the homicide occurred, and further, in the light of the qualification appended to the bill

of exception to the effect that appellant testified upon his trial that immediately after the homicide and while deceased was lying on the floor he (appellant) asked what had happened and stated that "it was an accident," we feel that we would not be warranted in holding that the error manifested by the bill of exception is harmless. Clearly, the question carried the strong implication that appellant made the statement inquired about. In this connection, it is observed that it is certified in the bill of exception that the assistant county attorney asked the question for the purpose of impeaching and contradicting the testimony of the appellant "who had just testified that he fired his gun to scare and without intent to shoot deceased, and that Calandra and not he had struck deceased." We think it is obvious that if appellant had answered the question in the affirmative he would have impeached and contradicted the testimony he had given upon his direct-examination as a witness upon the trial. The fact that in concluding his testimony relative to the things that occurred prior to the time that deceased was killed appellant testified that at such time he asked what had happened, and stated that it was an accident, would not seem to militate against the conclusion that the testimony as to appellant's statement to the county attorney and his assistant, if same had been proven, would have strongly tended to contradict and impeach the appellant. We say this in view of the fact that if the question had been answered in the affirmative without amplification the jury might have argued in their retirement that appellant himself, shortly after the homicide, had attempted to exculpate himself by falsely stating in effect that he knew nothing about the transaction which resulted in the death of the deceased, notwithstanding his testimony upon the trial consisted of a detailed statement of the incidents involved in the transaction which resulted in the death of the deceased. If this would have been the probable effect of an answer to the question, we think it cannot be said that the mere asking of the question, with its strong implication that appellant made the statement inquired about would not have had the same probable effect. In this connection, it is proper to observe that appellant's counsel felt that in the protection of appellant's rights he should object to the question being answered. The fact that counsel was forced to object placed appellant in a bad light before the jury, who naturally would have concluded that he would have answered the question in the affirmative if the objection had not been sustained. See Childress v. State, 241 S. W. 1029. It follows from what we have said that we are unable

to escape the conclusion that the question was obviously prejudicial and that therefore the instruction of the court was not calculated to save the appellant from injury. Coon v. State, 35 S. W. (2d) 419; Hunter v. State, 18 S. W. (2d) 1084; Hollingsworth v. State, 56 S. W. (2d) 869.

The judgment is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

BEAUCHAMP, Judge.

The State has filed a motion for rehearing in this cause and presented an earnest oral argument in its behalf. We have again reviewed the record on the question upon which it was reversed and think that the original opinion in this cause logically and exhaustively treats the question and that the proper conclusion was reached. We cannot adhere to the view advanced by the State that the question asked the appellant while on the witness stand was helpful to his theory of the case and therefore harmless error.

Appellant received the extreme penalty and no theory of helpfulness can find support in the jury's verdict. The question was an improper one. The court instructed the jury to disregard it and gave to the jury legal reasons for such instruction. There is nothing in the court's charge, and probably none could have been framed, which would serve to remove from the jury's mind the implication which the question carried,—that the appellant had contradicted himself, and it is quite possible that the court's discussion of the matter served to emphasize the position in which the appellant was thereby placed. Under the facts of this particular case, both the appellant and the court were helpless in an effort to remove the unfavorable impression from the jury.

The motion for rehearing is overruled.