### LEO LERA V. THE STATE.

No. 21363.  Delivered February 5, 1941.
Rehearing Denied March 19, 1941.
State's Request for Leave to File Second Motion for
Rehearing Denied (Without Written Opinion)
March 26, 1941.

410

The opinion states the case.

*Marsene Johnson, Jr.,* of Galveston, for appellant.

*Charles H. Theobald,* County Attorney, and *Emmett F. Magee,* Assistant County Attorney, both of Galveston, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

Leo Lera was given the death penalty for murder and he appeals.

This was the second trial of the case and the second time that a jury has given him the death penalty. The former appeal to this court is reported in Vol. 138, p. 127, Texas Cr. Rep.; 134 S. W. (2d) 248. The facts as stated in that opinion are herein referred to without being restated, except on the question of the conduct of the jury.

The evidence on the motion for a new trial reveals the fact that the jurors while deliberating on the case discussed that appellant is a notorious character in the City of Galveston; that he was reared by a mother in an atmosphere of crime. No such evidence was before the jury. These statements, together with other aggravating circumstances, make of this one of the most useless and regrettable homicides to be pictured. That he committed the murder there is no doubt; that he presented .evidence which would, if given full credit, justify hls action, or even

warrant an affirmative issue being submitted to the jury, is very doubtful.

Appellant sought a new trial after the jury's verdict and, as a principal ground therefor, alleged misconduct of the jury in considering his case. A. W. Kestler, the juror examined by the court, testified as touching the several questions raised as to the conduct of the jury that he heard the fact mentioned in the jury room that appellant had been tried and convicted previously and given the death penalty. He said that at the time he was taken on the jury he knew this fact so that it had nothing to do with his changing his vote from a life sentence to the death penalty, which he did during the progress of the jury's deliberation. It was stated in the jury room that Leo Lera's mother had been making bootleg liquor. This was after the jury had voted unanimously to find the defendant guilty, but before they arrived at the death penalty. The jury then stood seven for death, some for life and some for terms of years in the penitentiary. Somebody said he bought liquor from her. Someone also said that Leo Lera was a bootlegger and that he had been practically reared in crime. Two or three were talking about it. The juror didn't know whether these remarks were made by those concurring in favor of the death penalty or by those against it. A juror said that he was influenced to change his vote to a death penalty when someone made the remark that if Leo Lera got in the penitentiary for life and could get hold of a gun he would kill a couple of men to get out; that he had nothing to lose. Considerable discussion was made on this point which arose by reason of the fact that the juror himself said that he had been robbed and that the man who robbed him said that if he were sent to the penitentiary he would shoot his way out of there. The juror got to thinking about it in the light of his own experience and changed his mind the next morning.

The juror also testified that he heard the remark made in the jury room that Leo Lera had been sent to the federal penitentiary in January, 1933, and that one trip to the penitentiary should have taught him a lesson, but it didn't. He further says, "there were so many different things brought up that I don't know in what line of argument they came up."

The court examined the jurors and made his finding and conclusion. He said he could not conceive of any reasonable man giving the death penalty because of the things which took place in the jury room. If we were permitted to speculate on the effect of unauthorized testimony before a jury during their

deliberations, and this were the question before us, we might agree. It is not contended that the jury gave the death penalty because of these statements being made, but only that they were influenced to do so to some degree, the extent of which is immaterial. Neither are we permitted to speculate as to what the extent might have been.

It is our solemn legal duty and that of the trial court to resolve all doubt in such a case as this in favor of the party on trial and against the State. This duty rests with us regardless of the character of the party or the nature of the offense with which he stands charged. The protective features of the criminal procedure of our state are for the guilty as well as the innocent.

Under the reasoning in Mays v. State, 10 S. W. (2d) 1006, and the authorities therein discussed, we must hold that the trial court should have granted appellant's motion for new trial.

The prosecution says that the discussions were merely casual. This was true in the Mays case. We see no difference in a casual discussion from any other. The harm is in the facts which are brought into the jury room, not the manner of bringing them. True the manner of the discussion may affect the impression created, but we are not permitted to speculate on that any more than on any other question. There is no argument against results. Seven jurors were for the death penalty when this discussion began. Thereafter twelve voted for death.

Complaint is made also of the court's charges in that he did not submit to the jury affirmatively appellant's defense. Inasmuch as this case is being reversed on another question, and in view of the close question involved, we think it well to call attention to Rodriquez v. State, 4 S. W. (2d) 52, which ably expresses the law as applied to the facts of that case. If the question may be eliminated by a proper charge under the facts upon another trial it would appear to be advisable.

Because of the discussions which took place in the jury room during its deliberations, the judgment of the trial court is reversed and the cause remanded.

ON STATE'S MOTION FOR REHEARING

HAWKINS, Presiding Judge.

In view of the State's motion we have again reviewed the evidence on the issues raised by the motion for new trial and the findings of fact by the very able trial judge. He realized

the seriousness of the question raised by the substantial averments in the motion that, while the jury was divided as to the penalty, some jurors stated in the jury room that appellant's mother had been making bootleg liquor in the same house where appellant lived; that appellant was a bootlegger and had been practically raised in an atmosphere of crime; that the appellant's mother was a bootlegger; and some juror said he had bought bootleg whisky from her. The trial court says in his findings that:

"This allegation, together with the evidence adduced in support thereof, presents in the trial court's opinion the most serious point raised in said motion. I recognize this to be a close question and have given the matter very careful consideration."

It is to be regretted that more of our trial judges do not follow the example here found of advising this court of their findings when issues of fact are raised in motions for new trials. We are aided greatly by such finding, and are loath to disagree with the trial judge as to what the evidence established or his conclusions as to the effect thereof. However, under facts revealed upon the hearing of the motion for new trial, we are inclined to think the averments in the motion heretofore alluded to were sustained. Under the circumstances, we would be unwarranted in permitting a death penalty to stand where the very matters complained of as occurring in the jury room were without support in the evidence and were advanced by some juror or jurors upon the very issue of what penalty should be assessed, and at a time when seven jurors were for the death penalty and the other five for various terms of years. Something caused the five to come over to the seven. Speculation under the facts here present should not be indulged.

The State relies largely upon Henderson v. State, 132 Texas Cr. R. 596, 106 S. W. (2d) 291, in support of its motion for rehearing. The opinion in that case reveals some difference in the views of the members of the court. Some of the arguments used by the jurors in the present case are similar to those employed in the Henderson case, and as to such arguments that case might support the State's contention, but it is not upon that point the reversal here is predicated. The majority of the court in the Henderson case regarded the controversy among the jurors as purely argumentative and predicated in part upon an incident coming to the juror's attention, with which incident Henderson had no connection. Here, the things said in the jury

room upon which this reversal is based were statements by jurors which directly affected the appellant and his past conduct about which no evidence was in the record.

The State requests a clarification of the last paragraph of the original opinion in which reference is made to the case of Rodriguez v. State, 109 Texas Cr. R. 278, 4 S. W. (2d) 52. It was our purpose to direct attention to said case for guidance of the court in the event, upon another trial, the evidence raised the issue of an *accidental* discharge of the pistol while handled by appellant in such a manner that there was no apparent danger of causing death of the deceased or some other person.

The State's motion for rehearing is overruled.